IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

STEVEN KRAIG CANTRELL,

No. 2:07-cv-1440-MMM

        Petitioner,

   vs.

MICHAEL S. EVANS,

<u>ORDER</u>

        Respondent.

Petitioner Steven Kraig Cantrell, a state inmate incarcerated in Salinas Valley State Prison, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Cantrell was convicted of committing a lewd act upon a child under the age of 14 years and was sentenced to 25 years to life in prison under California's "Three Strikes" Law. For the reasons discussed below, the petition is DENIED.

I.    Background

    A. Facts and Procedural History

Cantrell was charged with three sex crimes: lewd or lascivious acts with a child under 14 years in violation of California Penal Code 288(A); oral copulation of a person under 14 years in violation of California Penal Code 288(A)(C)(1); and sex penetration with a foreign object of a victim under 14 years in violation of California Penal Code 289(J). At the close of evidence, the prosecution moved to dismiss the second count, oral copulation, and the trial court granted the motion.

Cantrell was convicted on the first count, lewd or lascivious acts with a child under 14 years, but the jury failed to reach a verdict on the third count, sex penetration with a foreign object.

Cantrell timely appealed his conviction to the California Court of Appeal for the Third Appellate District, which affirmed his conviction in an unpublished opinion on January 12, 2005.  Cantrell's petition for review to the California Supreme Court was denied on April 19, 2006.  He filed a petition for a writ of habeas corpus in the Shasta County Superior Court on September 25, 2006.  The county court denied his appeal on November 9, 2006.  Cantrell filed an appeal of that denial to the California Court of Appeal for the Third Appellate District on December 26, 2006, which was denied on February 1, 2007.  His further appeal to the California Supreme Court was denied on July 25, 2007.

Cantrell filed a *pro se* Petition for Writ of Habeas Corpus in the United States District Court for the Eastern District of California on July 19, 2007, which he first amended on October 19, 2007.  ("FAP")  The state answered this petition on March 19, 2009.  The state has conceded that the petition was timely filed and conceded that Cantrell exhausted all of the claims included in the FAP.  Cantrell filed a second motion to amend his petition on June 1, 2009, ("SAP") which this court granted on August 24, 2009, ordering the parties to first brief the statute of

1    limitations under the Antiterrorism and Effective Death Penalty Act of 1996

2    ("AEDPA") and any procedural bars that might prevent hearing the new claims on

3    their merits.  The State argued that the new claims added in the SAP should be

4    dismissed as time barred, that none of the new claims related back to those claims

5    included in the FAP, and that even if the claims in the SAP were not time-barred or

6    were found to relate back, they should be summarily dismissed because the

7    California Supreme Court denied habeas relief for the claims brought in the SAP

8    because the presentation of those claims was unjustified and substantially delayed,

9    providing an independent and adequate state procedural ground to deny those

10   claims.

11           The California Court of Appeal summarized the facts of Cantrell's case as

12   follows:

13           Joel H. (Mr. H.) was watching television in his bedroom in the evening on
14           October 10, 2003, when his nine-year-old granddaughter M. came into the room and
15           asked to talk to him.  Normally bubbly, M. was nervous, quiet, and obviously agitated.
16           She spoke in low tones.  M. told her grandfather she had been touching [Cantrell] in
17           "an insecure place."  Mr. H. turned the television off and asked M. to repeat what she
18           had said.  When she did, Mr. H. asked her to point to where she was talking about.  M.
19           pointed to her genitals.  After M.'s disclosure, Mr. H. found his wife in another part of
20           the house and told her what M. had said.

22           [Cantrell] is an ex-boyfriend of M.'s mother, Becky, and the father of B., M.'s
23           then four-year-old stepsister.  Although [Cantrell] and Becky had not resumed their
24           boyfriend/girlfriend relationship, [Cantrell] had been staying for the past several
25           months in the H.s' home in Redding, along with Becky and her daughters. [Cantrell]

1    was sleeping on the couch.  During the day while the other adults in the household were
2    working, [Cantrell] had been taking care of M. and B., as well as helping with the
3    household chores and cooking.
4
5    When Becky got up on the morning of October 11, 2003, her mother, Mrs. H.,
6    told her what M. had told Mr. H. the previous night.  Becky picked M. up from school
7    that afternoon.  Becky told M. she knew about M.'s conversation with her grandfather.
8    M. told her mother she had touched [Cantrell] and [Cantrell] had touched her on the
9    outside of her clothes.
10
11   Becky and M. returned to the H.s' home where Becky found [Cantrell] asleep
12   on the couch.  Becky told M. to go in the bedroom with Mrs. H.  Becky then slapped
13   [Cantrell] awake and demanded to talk to him.  They went into the den where Becky
14   told [Cantrell] that M. had said [Cantrell] was touching her outside of her clothing
15   and she was touching him.  Becky wanted to know if it was true.  [Cantrell] did not
16   answer, but ran his hands up over his head and shook his head.  When Becky asked
17   again if it was true, [Cantrell] said, "it's not like you think. It's not like -- it didn't
18   happen like, you know, you're thinking."  [Cantrell] stated M. had approached him
19   being curious and she had a lot of problems.  [Cantrell] suggested Becky get M. help.
20   Becky yelled at [Cantrell] to get his stuff and leave.  She told him to never come back
21   and that he would never see either of the girls again.  She said he "better keep running."
22   She told [Cantrell] she was not going to call the cops, but she would have some of
23   her friends handle it.
24
25   [Cantrell] left and went to see his friend, Curtis. [Cantrell] said his girl was
26   going to have a bunch of guys come beat him up and he was leaving.  [Cantrell] also
27   went to his mother's house.  She gave him money and suggested a couple of places he
28   could go.  The next day [Cantrell] went up to Oregon to stay with his aunt, Shirley.
29   He remained there until the time of his arrest on November 18, 2003.
30
31   A few days after [Cantrell] left the H.s' home, Becky contacted law
32   enforcement. Officer Mellon interviewed M. M. told Officer Mellon she had touched
33   [Cantrell] in a secure spot.  She said [Cantrell] had touched her private parts.  When
34   asked if [Cantrell] had asked her to touch him, M. said, "yes."  When asked if
35   [Cantrell] ever put his hand inside of her pants or clothing, M. said he had.  Officer
36   Mellon also asked M. if [Cantrell] had ever put his finger in her "opening."  Again
37   M. said he had.  M. did not mention these things until directly asked by Officer Mellon.

4

When asked if [Cantrell] had done anything else to make her feel uncomfortable, M. said [Cantrell] had licked his finger before he put it inside her.

After his arrest, Officer Mellon interviewed [Cantrell]. [Cantrell] contended M. was very curious and had initiated all the contact between the two of them. [Cantrell] said M. was "trying to get a grind on" and that she was "trying to cop a feel." [Cantrell] estimated M. had reached for his crotch or genital area approximately 15 times. [Cantrell] described three different specific instances. [Cantrell] told M. to stop and claimed he either spanked M. or threatened to spank her over her actions. After Becky "freaked out" about the accusations, [Cantrell] said he went to stay with his aunt in Oregon. He told Officer Mellon he commuted back and forth to Redding. Officer Mellon later determined this was a lie; [Cantrell] stayed in Oregon the entire time after he left the H's house and before his arrest.

At trial M. testified [Cantrell] asked her to touch him and told her not to tell anybody. She touched [Cantrell]'s penis, both outside of his clothing and "skin to skin." His penis looked like a long stick and felt rough and soft. She believed she touched [Cantrell]'s penis three or four times, only once skin to skin. M. testified one time [Cantrell] licked his finger and put it inside her private parts. There was also one other time [Cantrell] touched her private parts. M. testified [Cantrell] never put his mouth on her private parts and never asked her to put her mouth on his private part. However, later in her testimony, M. remembered telling Officer Mellon that [Cantrell] had licked her private parts one time. She stated she had told Officer Mellon the truth, but when asked again if [Cantrell] had ever put his mouth on her safe area, M. said: "Um, I don't remember. If he did, then I don't remember. I hardly have a memory of that." M. admitted she pulled [Cantrell]'s shorts down once as a prank. She admitted she was curious about [Cantrell]'s private parts.

At trial [Cantrell] called M.'s cousin Cassy as a witness. Cassy lived at the H.s' home during some of the time [Cantrell] was staying there. Cassy was 16 years old at that time. Cassy testified [Cantrell] had confided in her on three or four occasions he was having a problem with M. trying to rub and touch his private areas. Cassy said it "freaked [her] out" and she did not tell anyone else about it. It was hard to believe. Although she knew about [Cantrell]'s prior criminal offenses, she did not think he was the type of person who would molest a child. She was "shocked" when she learned of the charges against [Cantrell].

5

1    [Cantrell] also called Cassy's mother, Nancy, to testify.  Nancy testified one
2    time when she was at the H.s' house she opened a closed door to check on her niece
3    M. and her five-year-old son C.  She saw M. lying back on the bed with her legs open.
4    M. had C. by the arm and was trying to pull him down to her private area.  After that
5    Nancy imposed a "no closed doors" rule.  Nancy also knew about [Cantrell]'s prior
6    criminal offenses, but did not think he was the type of person who would molest a
7    child.
8
9    [Cantrell]'s mother testified she went to the H.s' home after she heard about the
10    allegation of touching between M. and [Cantrell].  [Cantrell]'s mother spoke to
11    Becky and M. together.  Becky told [Cantrell]'s mother that M. had inappropriately
12    touched [Cantrell], but [Cantrell] had not touched M.  [Cantrell] had not done
13    anything that had caused this to happen.  He did not ask M. to touch him.  [Cantrell]'s
14    mother asked M. if that was true and M. nodded her head yes.
15
16    [Cantrell] testified at trial he remembered at least three times when M. grabbed
17    for his penis intentionally.  M. grabbed his crotch when they were sitting together
18    playing a game on the computer, brushed up against his crotch when they were
19    roughhousing, and on another occasion put her hand in his lap.  [Cantrell] told her to
20    stop and disciplined her for her actions.  [Cantrell] did not tell Becky about M.'s
21    actions because he did not think she would handle it well.  [Cantrell] told Cassy
22    because he was more comfortable talking to her.
23
24    [Cantrell] testified one night he went into the bedroom where M. and C. were
25    supposed to be sleeping to turn down the television.  He saw them scoot away from
26    each other in the bed.  [Cantrell] asked them what was going on.  When C. stood up,
27    [Cantrell] observed C. had an erection sticking out of his zipper.  [Cantrell] sent C.
28    down the hall to his aunt's room, but did not tell anyone about the incident.
29
30    [Cantrell] testified he caught M. eavesdropping at doors in the H.s' house and
31    twice witnessed her masturbating.  M. once stole his towel when he was showering.
32    She tried to pull his pants down one time when they were in the kitchen.
33    [Cantrell] testified he lied to Officer Mellon about staying in Oregon the entire
34    time before his arrest because it was "none of his business" and not because
35    [Cantrell] did not want to admit he had failed to register with authorities in Oregon as
36    he was required to do.

1    (Lodged Doc. 1 at 3-9).

2         B. Standard of Review

3         This court may entertain a petition for writ of habeas corpus "in behalf of a

4    person in custody pursuant to the judgement of a State court only on the ground

5    that he is in custody in violation of the Constitution or laws or treaties of the

6    United States."  28 U.S.C. § 2254(a).

7         The writ may not be granted with respect to any claim that was adjudicated

8    on the merits in state court unless the state court's adjudication of the claim:

9    "resulted in a decision that was contrary to, or involved an unreasonable

10   application of, clearly established Federal law, as determined by the Supreme

11   Court of the United States; or (2) resulted in a decision that was based on an

12   unreasonable determination of the facts in light of the evidence presented in the

13   State court proceeding."  28 U.S.C. § 2254(d).

14        "Under the 'contrary to' clause, a federal habeas court may grant the writ if

15   the state court arrives at a conclusion opposite to that reached by [the Supreme]

16   Court on a question of law or if the state court decides a case differently than [the]

17   Court has on a set of materially indistinguishable facts."  Williams v. Taylor, 529

18   U.S. 362, 412-13 (2000).  "Under the 'reasonable application clause,' a federal

19   habeas court may grant the writ if the state court identifies the correct governing

7

1   legal principle from [the] Court's decisions but unreasonably applies that principle

2   to the facts of the prisoner's case." Id. at 413.

3         "[A] federal habeas court may not issue the writ simply because the court

4   concludes in its independent judgment that the relevant state-court decision applied

5   clearly established federal law erroneously or incorrectly.  Rather, that application

6   must also be unreasonable." Id. at 411.  A federal habeas court making the

7   "unreasonable application" inquiry should ask whether the state court's application

8   of clearly established federal law was "objectively unreasonable." Id. at 409.

9         The only definitive source of clearly established federal law under 28 U.S.C.

10   § 2254(d) is in the holdings (and not the dicta) of the Supreme Court as of the time

11   of the state court decision.  Id. at 412.  While circuit law may be "persuasive

12   authority" for purposes of determining whether a state court decision is an

13   unreasonable application of Supreme Court precedent, only the Supreme Court's

14   holdings are binding on the state courts and only those holdings need be

15   "reasonably" applied.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

16         When a federal court is presented with a state court decision that is

17   unaccompanied by a rationale for its conclusions, the federal court has no basis

18   other than the record "for knowing whether the state court correctly identified the

19   governing legal principle or was extending the principle into a new context."

8

1    <u>Delgado v. Lewis</u>, 223 F.3d 976, 981-82 (9th Cir. 2000), <u>overruled on other</u>

2    <u>grounds by</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75-76 (2003).  In such situations,

3    federal courts must conduct an independent review of the record to determine

4    whether the state court decision is objectively unreasonable.  <u>Id.</u>  While federal

5    courts "'are not required to defer to a state court's decision when that court gives

6    [them] nothing to defer to, [they] must still focus primarily on Supreme Court

7    cases in deciding whether the state court's resolution of the case constituted an

8    unreasonable application of clearly established federal law.'"  <u>Greene v. Lambert</u>,

9    288 F.3d 1081, 1089 (9th Cir. 2002) (quoting <u>Fisher v. Roe</u>, 263 F.3d 906, 914

10   (9th Cir. 2001)).  Independent review of the record is not de novo review of the

11   constitutional issue, but rather the only way a federal court can determine whether

12   a silent state court decision is objectively unreasonable.  <u>Himes v. Thompson</u>, 336

13   F.3d 848, 853 (9th Cir. 2003).

14   II.    Claims from Cantrell's First Amended Petition

15         A.    Introduction of Cantrell's Prior Rape Conviction

16              Cantrell argues that his due process rights were violated by the admission of

17   his prior rape conviction as propensity evidence because the prejudicial value so

18   outweighed any probative value that it prevented him from receiving a fair trial.

19   Cantrell was convicted in 1987 of violently raping an adult woman and sentenced

1     to seventeen years in prison.  The rape, committed with two other men, involved

2     forcing the victim to perform oral sex and forcibly sodomizing her.  Cantrell

3     argues that a forcible gang rape of an adult woman is so dissimilar to the charged

4     offense that it does not show propensity and that allowing the conviction into

5     evidence violated his due process right to a fair trial.

6          The trial court found that although this sex offense was in some ways

7     dissimilar to the accusation against Cantrell in this case because of the age of the

8     victim and whether force was involved, the two offenses also shared a common

9     element of a "predatory disposition" or a "disposition to exploit others for sexual

10    purposes and sexual gratification." (Lodged Doc. 18 [Reporter's Transcript on

11    Appeal vol. 1] p. 57-58).  The state appellate court held that admitting the

12    conviction violated neither state nor federal constitutional law.

13         The Supreme Court has explicitly declined to rule "on whether a state law

14    would violate the Due Process Clause if it permitted the use of 'prior crimes'

15    evidence to show propensity to commit a charged crime." Estelle v. McGuire, 502

16    U.S. 62, 75 n.5 (1991).  Because the Supreme Court has explicitly refused to rule

17    on the issue, the state appellate court's ruling cannot be said to be contrary to, or an

18    unreasonable application of, clearly established federal law as determined by the

19    Supreme Court.

1    Cantrell also argues that the introduction of his prior conviction via a

2    certified copy of the record violates his Sixth Amendment right to confront

3    witnesses against him.  However, the state court of appeal held that because

4    Cantrell failed to object to the method of proof at trial, he forfeited any

5    Confrontation Clause claim.  (Lodged Doc. 1 at 15-17 (citing People v. Anderson,

6    25 Cal. 4th 543, 586 (Cal. 2001)).  Where a state court adjudicates a constitutional

7    claim "on a state law ground that is independent of the federal question and

8    adequate to support the judgment," the federal courts may not disturb that finding.

9    See Coleman v. Thompson, 501 U.S. 722, 729 (1991).  The trial transcript shows

10   that although Cantrell objected to the introduction of the conviction as unduly

11   prejudicial, the state appellate court was correct that he did not object on

12   Confrontation Clause grounds. (Lodged Doc. 18 [Reporter's Transcript vol. 1] at

13   48).  Therefore, the claim is procedurally barred.

14   Cantrell argues, in the alternative, that if his Sixth Amendment claim was

15   procedurally barred because his attorney failed to object, that this failure amounts

16   to ineffective assistance of counsel.  The state court of appeals held that "a rational

17   tactical purpose for failing to raise a confrontation clause is readily apparent on the

18   face of the record."  Insisting that the victim testify about the rape would have

19   served no purpose, as there was no dispute about the facts.  (Lodged Doc. 1 at 18).

11

1    By instead allowing the conviction to be introduced via a certified copy of the

2    record, Cantrell's attorney preventing the jury from learning highly prejudicial

3    details about his previous offense. The state court of appeal therefore held that

4    Cantrell could not demonstrate either deficient performance or prejudice. Id. That

5    determination is neither contrary to nor an unreasonable application of the

6    Supreme Court's ineffective assistance of counsel jurisprudence. See Strickland v.

7    Washington, 466 U.S. 668 (1984).

8         B.    Confrontation Clause and Right to Glare at the Victim

9         Cantrell argues that the trial court violated his right to confront his accuser

10   by instructing him that he was not permitted to glare at the victim. (Lodged Doc.

11   18 [Reporter's Transcript vol. 1] at 22).  Cantrell's argument is that the

12   confrontation clause protects not only the right to cross-examination, but also the

13   right to a direct, face-to-face encounter with the witness.  Instructing him not to

14   glare, he argues, may have allowed the jury to infer guilt from his facial expression

15   because they would "expect that an innocent man being falsely accused would

16   glare harshly at his false accuser." Pet. for Writ of Habeas Corpus at 9-10.

17   Although Cantrell did not object on this ground, the state appellate court declined

18   to invoke the general rule that failure to object forfeits the claim.  (Lodged Doc. 1

19   at 27).  Instead, it ruled on the merits of his claim and, citing Maryland v. Craig,

1    497 U.S. 836, 849-50 (1990), held that the prohibition on glaring at the victim did

2    not violate Cantrell's Sixth Amendment right to confront witnesses against him.

3          The Supreme Court has held that although "face-to-face" confrontation with

4    an accuser is important, "we cannot say that such confrontation is an indispensable

5    element of the Sixth Amendment's guarantee of the right to confront one's

6    accusers." Id. The Supreme Court has sanctioned allowing child witnesses to

7    testify without coming face-to-face with the defendant, see id. at 857, and has

8    never held that the accused has the right to glare at a child victim. Therefore the

9    state appellate court's conclusion that instructing Cantrell not to glare at the victim

10   was not a violation of his confrontation clause rights is not contrary to clearly

11   established federal law.

12         C.    Jury Instructions

13         Cantrell argues that his due process rights were violated by three jury

14   instructions given at trial. The challenged jury instructions are (1) a discovery

15   sanction instruction pertaining to a late disclosure of witnesses' statements; (2) a

16   permissive inference instruction about flight to avoid apprehension; and (3) an

17   instruction not to consider for any purpose the fact that one count of the indictment

18   was dismissed.

19         A jury instruction violates due process if it relieves the prosecution's burden

1    of proving every element of a charged offense beyond a reasonable doubt.  See

2    Henderson v. Kibbe, 431 U.S. 145, 153 (1997).  A jury instruction only violates

3    due process if there is a reasonable likelihood that the jury has applied the

4    challenged instruction in a manner that violates the federal Constitution.  Estelle,

5    502 U.S. at 72.  To obtain federal habeas relief based on a deficient jury

6    instruction, a petitioner must show that the error "so infected the entire trial that the

7    resulting conviction violates due process."  Id. (quoting Cupp v. Naughten, 414

8    U.S. 141, 147 (1973)).  Moreover, "[i]t is well-established that the instruction 'may

9    not be judged in artificial isolation,' but must be considered in the context of the

10   instructions as a whole and the trial record."  Id. (quoting Cupp, 414 U.S. at 147).

11        Cantrell argues that a jury instruction given as a discovery sanction violated

12   due process.  Cantrell's attorney erroneously believed that statements he had taken

13   from two witnesses, M.'s adult cousin and M.'s aunt, were attorney work product

14   (see Lodged Doc. 1 at 29) and failed to turn them over to the prosecutor until the

15   day trial began.  The trial court granted a prosecution motion for a jury instruction,

16   CALJIC 2.28, which instructed the jury that the defense unlawfully failed to

17   disclose those statements and that they could take this into consideration in

18   weighing the testimony of those witnesses.  Id.  M.'s cousin Cassy testified that

19   Cantrell told her on multiple occasions that M. had touched him inappropriately

14

1    and had expressed concern about this behavior. (Lodged Doc. 20 [Reporter's

2    Transcript vol. 3] at 601-03). M.'s aunt Nancy testified that she had once walked

3    in on M. engaging in inappropriate sexual behavior with Nancy's son, C., who is

4    about a year younger than M. Id. at 662-63. Nancy said that she saw M. try to

5    physically force C. to touch M.'s genital area. Id.

6        The state appellate court held that the trial court erred by giving this

7    instruction. It reasoned the instruction was error, citing People v. Bell, 118

8    Cal. App. 4th 249 (Cal. Ct. App. 2004), because it might have led the jury to think

9    that Cantrell, and not his attorney, was to blame for the late disclosure; because the

10   jury might have inferred that court had found that the prosecution was actually

11   disadvantaged by the late disclosure; because the instruction fails to offer guidance

12   about how to remedy any disadvantage to the prosecution; and because the

13   instruction does not include a caution that untimely disclosure, standing alone,

14   cannot prove that the defendant is guilty beyond a reasonable doubt. (See Lodged

15   Doc. 1 at 31).

16       The state appellate court concluded, however, that any such error was

17   harmless under California law because "the focus of the prosecution remained on

18   defendant's credibility" and not on the credibility of these two witnesses. Id. at 32.

19   The state appellate court went on to assert the fact that the jury did not convict

15

1    Cantrell of digitally penetrating M. showed that the jury did not find him guilty of

2    committing a lewd act with a child "simply on the untimely discovery." Id. at 33.

3    The court relied on the same harmless error analysis in rejecting Cantrell's federal

4    constitutional claim that his due process rights were violated and concluded that

5    Cantrell was not denied "a meaningful opportunity to present a complete defense."

6    Id.

7         The proper inquiry in reviewing a jury instruction for constitutional defects

8    in a habeas case is "whether the ailing instruction by itself so infected the entire

9    trial that the resulting conviction violates due process." Estelle, 502 U.S. at 72.

10   Cassy and Nancy did not provide testimony that would directly exonerate Cantrell.

11   (Lodged Doc. 20 [Reporter's Transcript vol. 3] at 601-678).  They did not witness

12   any instances of M. inappropriately touching Cantrell, nor could they offer any

13   direct evidence that Cantrell had not improperly touched M.  Id.  They could only

14   provide some corroboration of his defense that he did not improperly touch M.,

15   rather M. improperly touched him as part of a pattern of sexual acting out behavior.

16   This corroboration duplicated another piece of significant corroborating

17   evidence—M.'s own testimony admitting that she was curious about Cantrell's

18   penis.  Even if Cantrell could establish that the jury did not believe Cassy's and

19   Nancy's statements about what they witnessed as a result of the erroneously-given

16

1    jury instruction, he could not show that this so obviously "infected the entire trial

2    with unfairness" that the state appellate court decision is contrary to or an

3    unreasonable application of clearly established federal law.  The court must

4    therefore defer to the state appellate court's determination that the jury instruction

5    did not violate Cantrell's due process rights.[1]

6          Cantrell argues that a jury instruction on flight was unconstitutional because

7    he fled out of fear of being physically harmed by friends of M.'s mother, not out of

8    consciousness of guilt.  It is undisputed that M.'s mother did indeed threaten

9    Cantrell and told him after kicking him out of her parent's house that "he better

10   keep running." (Lodged Doc. 18 [Reporter's Transcript vol. 1] at 179).  The jury

11   instruction, modified from CALJIC 2.52, instructed the jury that flight after being

12   accused of a crime "is not sufficient in itself to establish his guilt, but is a fact

13   which, if proved, may be considered by you in the light of all other proved facts in

14   deciding whether a defendant is guilty or not guilty.  The weight to which this

15   circumstance is entitled is a matter for you to decide." (Lodged Doc. 20

---

[1] Even if the state court's reasoning is less than crystal clear, the result is the same.  An independent review of the record confirms that the instruction was not constitutionally defective and the state court did not clearly err.  See Delgado, 223 F.3d at 982 ("Federal habeas review is not de novo when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law.").

1    [Reporter's Transcript vol. 3] at 788).

2           The state appellate court held that this instruction did not violate Cantrell's

3    due process rights because the inference between flight and guilt is permissive and

4    because a reasonable person could find a connection between flight and guilt.

5    Quoting Francis v. Franklin, 471 U.S. 307, 314-315 (1985), the state appellate

6    court noted "'a permissive inference violates the due process clause only if the

7    suggested conclusion is not one that reason and common sense justify in light of

8    the proven facts before the jury.'" Here, the suggested conclusion can be justified

9    as reasonable in light of the evidence introduced at trial, including the fact that

10   Cantrell failed to register as a sex offender in Oregon, which made locating him

11   more difficult when M.'s mother contacted the police. (Lodged Doc. 1 at 39). The

12   jury was free to reject the inference that Cantrell fled because he was guilty and

13   feared prosecution, and instead believe Cantrell that he had fled out of fear of

14   reprisal from M.'s mother's friends. In light of the evidence presented at trial,

15   adopting the inference would not have violated Cantrell's due process rights. The

16   state court's decision was not contrary to, or an unreasonable application of, clearly

17   established Supreme Court precedent.

18          Cantrell argues that a jury instruction about a dismissed charge violated his

19   due process rights by preventing the jury from considering M.'s credibility. At the

18

1    close of evidence, the prosecution moved to dismiss Count 2, which alleged that

2    Cantrell had engaged in oral copulation with the victim.  (Lodged Doc. 20

3    [Reporter's Transcript vol. 3] at 746).  The trial court instructed the jury that it

4    could not "consider this fact for any purpose" and that the dismissal was "not

5    relevant to whether the defendant is guilty or not guilty of any remaining count."

6    (Lodged Doc. 1 at 40).  Cantrell argues that this instruction prevented the jury from

7    considering the possibility that M. had lied to a police investigator about whether

8    Cantrell had licked her genitals.  M. testified that Cantrell had not, in fact, licked

9    her genitals, but also asserted that when she told the investigator that he had, she

10   had been telling the truth.

11        The state appellate court found that the jury instruction merely told the

12   jurors not to consider the *dismissal* of Count 2 and did not prevent them from

13   considering whether M.'s testimony and prior statements about oral copulation

14   undermined her credibility.  Id. at 41.  The state court also noted that the jury

15   instruction on the dismissed count had to be considered in light of all of the other

16   jury instructions, including instructions on prior inconsistent statements,

17   believability of the witnesses, and weighing conflicting evidence.  Id.  In that light,

18   the state court held that it was not "reasonably probable" that the jury had applied

19   the instruction about the dismissed count in violation of Cantrell's constitutional

19

1    rights.  Id. at 43 (citing Estelle, 502 U.S. at 72).  Because the jury instructions did

2    not bar the jury from considering M.'s credibility, the state court decision is not

3    contrary to, or an unreasonable application of, clearly established federal law.

4         D.    Ineffective Assistance of Counsel

5         Cantrell argues that his counsel was constitutionally deficient because his

6    trial attorney failed to: (1) present evidence at a pretrial hearing; (2) establish that

7    Cantrell was in another town for part of the summer; (3) ask M.'s aunt Nancy

8    about M.'s truthfulness and knowledge about sex; (4) ask M.'s cousin Cassy about

9    M. masturbating in front of Cassy and Cantrell; (5) present the defense's private

10   investigator as an expert witness; (6) introduce a police report which would show

11   that M. had made prior inconsistent statements; (7) ask M.'s grandfather about

12   M.'s statements that she initiated inappropriate contact with Cantrell; and (8)

13   object to alleged misstatements by the prosecutor.

14        To prevail on a claim of ineffective assistance of counsel, Cantrell must

15   establish that counsel performed deficiently and that this deficient performance

16   prejudiced the defendant, resulting in an unreliable verdict.  Strickland, 466 U.S. at

17   687-88.  Deficient performance is representation that falls below an "objective

18   standard of reasonableness."  Id. at 688.  In assessing counsel's performance,

19   courts must defer to the reasonable professional judgment of a trial counsel and

1  presume that counsel's conduct falls within a "wide range" of "reasonable"

2  professional representation. Id. at 689. If the court finds that counsel's

3  performance was not deficient, it need not address the prejudice prong of the

4  Strickland test. Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998). If

5  deficient performance is established, then the court must analyze whether that

6  deficiency was so serious as to deprive Cantrell of a fair trial. See Strickland, 466

7  U.S. at 687. The question is whether there is a "reasonable probability that[ ] but

8  for" the trial attorney's deficient performance, the result would have been different.

9  Id. at 698. In other words, prejudice should be found only if the deficient

10 performance undermines this court's confidence in the verdict. Id.

11       In Cantrell's case, because the California Supreme Court denied his habeas

12 writ without explaining its reasoning, the court "looks through" the Supreme

13 Court's denial of the writ to last reasoned decision, which is that of the Shasta

14 County Superior Court. See Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th

15 Cir. 2000). The county court cited a California Supreme Court decision restating

16 the Strickland standard to hold that "[w]ith respect to the instant petition for relief

17 on habeas corpus, the court finds petitioner's allegations insufficient to meet the

18 initial pleading requirements for relief on the grounds asserted." Because the state

19 court failed to explain why Cantrell's allegations are "insufficient," this court

21

1    engages in independent review of Cantrell's ineffective assistance claims pursuant

2    to <u>Delgado</u>, 223 F.3d at 982.

3          Cantrell argues that his counsel's failure to present witnesses at a pretrial

4    hearing deprived him of an opportunity to establish his "innocence of all counts."

5    Cantrell has not identified, much less presented to the state court or this court, any

6    evidence which his attorney failed to present at this hearing which could have

7    affirmatively established his innocence.  In any event, there is no question that the

8    state had ample evidence to establish probable cause, so failing to produce

9    speculative evidence at this hearing cannot amount to deficient performance.

10         Cantrell argues that his counsel's failure to show that he was living outside

11   of Shasta County for part of the summer of 2003 amounts to ineffective assistance.

12   Apparently, Cantrell's claim is that his attorney failed to present evidence that

13   would establish an alibi.  But Cantrell does not dispute that he was living with M.'s

14   family for much of that summer, so his residence outside of Shasta for part of the

15   summer would not establish that he lacked access to M. and could not have

16   molested her.  Nor can he escape the fact that he was living with M's family at the

17   time the most recent events led to his arrest.  Because there was no possibility of an

18   alibi defense, failing to attempt one cannot amount to deficient performance.

19         Cantrell claims that his counsel was ineffective for failing to introduce

22

1    testimony from M.'s aunt Nancy that M. had watched sexually explicit movies and

2    that she believed that M. was not a truthful child.  In his habeas writ, Cantrell

3    included a report from an investigator hired by the defense which stated that Nancy

4    had said "I have seen her make up stories . . . ." and "[t]here is not a lot of

5    shielding [from] movies." (Pet. for Writ of Habeas Corpus, Exhibits Section at 40-

6    41).  Although Cantrell's attorney did not use this evidence, he introduced Nancy's

7    testimony that M. had previously engaged in sexual behavior and the jury had

8    other, much more persuasive evidence impeaching M.'s credibility—her own

9    testimony that she had not lied when she told a police investigator that Cantrell had

10   licked her genitals coupled with her insistence that Cantrell had not done so.

11        Whether M. had ever watched age-inappropriate movies was of limited

12   relevance to whether Cantrell had inappropriately touched her, and there was more

13   significant evidence impeaching her credibility.  Thus, the fact that Cantrell's

14   attorney did not question Nancy about these two topics does not amount to

15   deficient performance sufficient to reverse the state court's ruling.

16        Cantrell claims that his counsel was ineffective for failing to introduce

17   testimony from M.'s cousin Cassy that she had witnessed M. masturbate in front of

18   Cantrell.  In his habeas writ, Cantrell included a report from a defense investigator,

19   stating that Cassy had said she had seen M. "'playing with herself'" in front of

23

1    Cantrell in the living room of M.'s home.  (Pet. for Writ of Habeas Corpus,

2    Exhibits at 44-45).  Cassy reportedly said that "'[M.] was sitting on the couch and

3    Steve was in the green chair.  [M.] had a T-shirt on, had her feet and knees pulled

4    up and the T-shirt over her knees.  She was playing with herself.'"  Id.  Cassy went

5    on to make clear that she was certain that M. was masturbating and was

6    "apparently not concerned who observed her."  Id.

7         Although not introducing this evidence was arguably a failure by Cantrell's

8    attorney given the defense theory of the case, any claimed error by counsel does

9    not so clearly undermine this court's confidence in the verdict that the state court's

10   rejection of Cantrell's ineffective assistance claim was contrary to or an

11   unreasonable application of clearly established federal law as determined by the

12   Supreme Court.

13        Cantrell argues that his attorney's failure to put on the defense investigator

14   as an expert witness or use him to bolster Nancy's and Cassy's testimony at trial

15   constituted ineffective assistance.  Cantrell has not presented any evidence that the

16   investigator would have been qualified to testify as an expert under California law,

17   so he cannot establish that his attorney's failure to call the investigator as an expert

18   was deficient performance.  Cantrell could not have used the investigator to bolster

19   Nancy's and Cassy's credibility at trial because any testimony about what they had

24

1    said would have been inadmissible hearsay.  A failure to attempt to introduce

2    inadmissible evidence cannot amount to deficient performance.

3         Cantrell argues that his attorney's failure to introduce a police report that

4    would show that M. had made prior inconsistent statements constitutes ineffective

5    assistance.  The only potentially inconsistent statement was the officer's report that

6    M. did not tell her mother that Cantrell had touched M.  (Pet. for Writ of Habeas

7    Corpus, Exhibits at 53).  Cantrell appears to assert that the police report could have

8    been used to impeach M.'s credibility.  Because the relevant statement is double

9    hearsay—the police officer was recording a statement M.'s mother made to him

10   relaying a statement that M. made to her—it is only admissible to impeach *M.'s*

11   *mother's* testimony, not to impeach M's testimony.  Significantly, M.'s mother

12   never testified inconsistently with this statement, so there was no opportunity to

13   introduce the police report into evidence.  Therefore, Cantrell cannot establish

14   deficient performance.

15        Cantrell argues that defense counsel was deficient for failing to further

16   investigate M.'s grandfather's statements during sentencing that M. told multiple

17   family members that she initiated inappropriate contact with Cantrell.  Cantrell

18   cannot demonstrate that further evidence about M.'s statements would have

19   changed his sentence as the sentencing judge was the trial judge and already aware

25

1  of many inconsistencies between M.'s trial testimony and M.'s previous statements

2  to family members and investigators.  It is also clear from the sentencing transcript

3  that the judge would not have allowed Cantrell's counsel to ask any further

4  questions on the issue:

5      MR. LYMAN: . . . [Y]ou mentioned that you believe that [M.]
6      initiated this contact, is that correct?
7      A: (Nodding head.)
8      Q: What is it that you base that belief on?
9      THE COURT: Counsel, let me stop you because when I told counsel
10     this person would be giving a statement, if we are going to have a
11     statement that starts taking on the flavor of trial testimony, I am not
12     sure this is the forum for that.

13  (Lodged Doc. 21 [Reporter's Transcript vol. 4] at 919).  The trial court then

14  allowed M.'s grandfather to answer the question, but cut off any further testimony,

15  saying "it's not proper at this point."  Id. at 920.  Cantrell does not argue that this

16  ruling was incorrect, so he cannot establish deficient performance via his attorney's

17  compliance with that ruling.

18      Cantrell argues that his counsel's failure to object to the prosecutor's

19  "extremely erroneous and inflammatory remarks" was deficient performance, but

20  the comments that Cantrell identifies in his petition at most overstate the strength

21  of the evidence against him, a flaw in the prosecutor's closing statement that

22  Cantrell's counsel emphasized.  (Lodged Doc. 20 [Reporter's Transcript vol. 3] at

1    824).  Cantrell's counsel argued that M.'s testimony was inconsistent with her

2    pretrial statements, internally contradictory, and included assertions that simply

3    didn't make sense.  Id.  Cantrell's counsel particularly emphasized that M. had

4    contradicted herself about whether Cantrell had licked her genitals and that M.

5    claimed that she touched Cantrell's penis "skin to skin," yet also insisted that

6    Cantrell was wearing pants at the time and that she had not reached inside them.

7    Id. at 824, 835-42.  Cantrell cannot therefore establish either that the prosecutor

8    made objectionable statements or that his counsel's method of responding to the

9    prosecutor's closing constituted deficient performance.

10          After conducting an independent review of the record, the court concludes

11   that the state court decision rejecting Cantrell's eight claims of ineffective

12   assistance of counsel is not contrary to or an unreasonable application of clearly

13   established federal law.

14          E.     Prosecutorial Misconduct

15          Cantrell argues that the prosecutor committed several acts of prosecutorial

16   misconduct during the trial.  As to this claim, the county court invoked the

17   procedural bar established by In re Dixon, 41 Cal. 2d 756, 759 (Cal. 1953), which

18   precludes habeas petitioners from raising claims in habeas which could have been

19   raised on direct appeal:

27

1    The petitioner also asserts misconduct by the prosecution at trial in
2    knowingly using false statements. Petitioner does not demonstrate an
3    exception to the general rule that a court will dismiss a habeas corpus
4    petition if it alleges an issue "that could have been, but was not, raised
5    on direct appeal."

6    (Lodged Document 6 at 1 (citing In re Harris, 5 Cal. 4th 813, 829 (Cal. 1993);

7    Dixon, 41 Cal.2d at 759)).  This claim of prosecutorial misconduct is based on

8    conduct which is reflected in the trial record and not on any extra-record evidence,

9    which means it could have been raised on direct appeal.  Therefore, this is an

10   adequate and independent state law reason for refusing to reach the merits of

11   petitioners claim.  See Coleman, 501 U.S. at 729-30.  The claim is procedurally

12   barred.

13   III.   Second Amended Petition

14         A.   AEDPA's Statute of Limitations and Equitable Tolling

15         Cantrell's FAP was filed on July 19, 2007, long after Congress enacted the

16   AEDPA in 1996.  AEDPA applies to all petitions for writ of habeas corpus filed

17   after its enactment.  AEDPA enacted a one-year period of limitation within which a

18   petitioner must file a petition for writ of habeas corpus.  28 U.S.C. § 2244(d)(1)

19   and (2).  Pursuant to § 2244(d)(1)(A), Cantrell's one-year period runs from the date

20   on which judgment became final by the conclusion of direct review or the time to

21   seek appeal.  The Ninth Circuit has held that AEDPA begins to run 90 days after

1    the highest state court enters its judgment.  Shannon v. Newland, 410 F.3d 1083,

2    1086 (9th Cir. 2005).

3          Cantrell's time to file a petition for writ of certiorari to the United States

4    Supreme Court on direct review expired July 18, 2006, 90 days from the California

5    Supreme Court's denial of the petition for review.  Cantrell thus had one year (365

6    days) from July 18, 2006, within which to file a petition for writ of habeas corpus.

7    Between that date and the filing of his original *pro se* petition for writ of habeas

8    corpus with this court, Cantrell filed three state court petitions for writ of habeas

9    corpus.  Cantrell's initial petition for writ of habeas corpus was filed with the

10   Shasta County Superior Court on September 25, 2006.  His final petition before the

11   California Supreme Court was denied on July 25, 2007.  During the pendency of

12   these petitions, 303 days in all, the statute of limitations was tolled.  28 U.S.C.

13   § 2244(d)(2); Duncan v. Walker, 533 U.S. 167, 176 (2001).  Thus, Cantrell's final

14   deadline to file all fully exhausted claims was May 16, 2008.

15         The state concedes that the FAP was timely filed.  However, Cantrell filed

16   the SAP on June 1, 2009, adding eight new claims.  Claims 9 and 13 allege error in

17   the failure of trial counsel to request, and the trial court to provide sua sponte, a

18   unanimity instruction as provided by CALJIC 17.01.

19         Claims 10, 11, and 12 allege that Cantrell's appellate counsel provided

29

ineffective assistance.  Claim 10 alleges failure of appellate counsel "to raise a

crucial issue of (CALJIC 17.01) unanimity."  Claim 11 alleges failure of appellate

counsel to challenge Cantrell "being sentenced to an illegal statute."  Claim 12

alleges failure of appellate counsel to verify that the charging documents from

Cantrell's previous sentences raised at trial were "true and correct."

Claims 14 and 15 allege error by the trial court at sentencing.  Claim 14

alleges that the trial court violated Cantrell's due process rights by sentencing him

under PC 667.61(a), "The One Strike Law," which was not included in the

charging documents and therefore "outside [the court's] jurisdiction.  SAP at 6(d).

Claim 15 alleges that the trial court violated due process rights because failure to

make a finding as to the "Habitual Sexual Offender" special allegation on

Cantrell's charging documents acts as an acquittal and thus, Cantrell is illegally

held.  Id.

Claim 16 alleges that Cantrell's Sixth Amendment right to a fair trial and his

Fifth and Fourteenth Amendment due process rights were violated by the

prosecution's misconduct.  Specifically, Cantrell alleges that the prosecutor used

two prior charges for which Cantrell was actually acquitted to establish propensity

evidence.

The state urges dismissal of the new claims as time barred.  As discussed

1    below, none of the new claims relate back to the timely claims brought in the first

2    amended petition.[2] Thus, unless the one-year statute of limitations under AEDPA

3    is further tolled, the claims in Cantrell's SAP are time barred, as the SAP was filed

4    more than a year after the May 16, 2008, deadline.  Cantrell claims that the statute

5    of limitations should be tolled, both by time he spent in administrative segregation

6    and by the time his second habeas petition was pending before the California state

7    courts.

8         Cantrell was placed in administrative segregation on April 18, 2008, and

9    stayed there until July 14, 2008, a total of 87 days.[3]  Cantrell argues that while he

10   was in administrative segregation, he was entitled to equitable tolling because his

11   access to legal materials and case law was severely limited.  Cantrell filed a second

12   round of state habeas petitions on July 2, 2008, which were finally rejected by the

13   California Supreme Court on May 13, 2009.  If Cantrell merited equitable tolling

14   for his time in administrative segregation, then his second round of state habeas

15   petitions, filed July 2, 2008, would fall within the statute of limitations.

---

[2] The state also argues that the SAP should be summarily dismissed because the California courts denied relief on the ground that the Cantrell's second round of state habeas petitions as successive and therefore untimely.  The court does not address this question, as the claims in the SAP are denied as untimely under AEDPA.

[3] Cantrell calculates 86 days.  The difference is immaterial.

31

1       To merit equitable tolling, Cantrell must show that he has been pursuing his

2    rights diligently and that extraordinary circumstances beyond his control made it

3    impossible for him to file his petition on time.  Waldron-Ramsey v. Pacholke, 556

4    F.3d 1008, 1011 (9th Cir. 2009).  In cases where the Ninth Circuit has granted

5    equitable tolling due to deprivation of legal materials, successful petitioners have

6    argued that they were without access to all of their files.  See, e.g., Lott v. Mueller,

7    304 F.3d 918, 924-925 (9th Cir. 2002) (petitioner filed his petition only seven days

8    late although deprived of all his files for at least 82 days); Espinoza-Matthews v.

9    California, 432 F.3d 1021, 1027-28 (9th Cir. 2005) (remanding to the district court

10   to determine whether the petitioner's complete lack of access to his file made

11   timely filing impossible).  Conversely, where a petitioner is in administrative

12   segregation and has "limited access to 'the law library [and] copy machine,'" the

13   Ninth Circuit has held such "ordinary prison limitations" do not toll the statute of

14   limitations.  Ramirez v. Yates, 571 F.3d 993, 998 (9th Cir. 2008).  The reason for

15   this standard is easy to understand.  Prison life by its nature includes day-to-day

16   security restrictions that can be seen as impeding a petitioner's ability to do his

17   work, but tolling every day of a prisoner's stay in administrative segregation would

18   amount to an exception that would swallow AEDPA's limitations period.  Id.

19       Cantrell does not argue he was wholly deprived of access to his legal file, or

32

1    any other legal materials, merely that his access to "legal materials; books; case

2    law, etc." was "severely limited" while he was in administrative segregation.

3    Reply at 2. Cantrell also states that his time in administrative segregation allowed

4    him to discover the second set of claims. During that time, he made the

5    acquaintance of Kenneth Brown, the self-styled jailhouse lawyer who

6    "found/recognize[d] claims [9] - [16], and helped [Cantrell] put those issues

7    together." Id. Notably, Cantrell filed the second state habeas petition on July 2,

8    2008, 12 days before he was released from administrative segregation. On these

9    facts, Cantrell provides no evidence that his time in administrative segregation

10   constituted extraordinary circumstances beyond his control to timely file his

11   second round of petitions. Cantrell's time in administrative segregation also fails

12   to explain his inactivity in the months prior to his placement in administrative

13   segregation. As Cantrell is not entitled to equitable tolling during his time in

14   administrative segregation, his second round of habeas petitions was not timely

15   filed, and this court need not rule on whether the second round of petitions should

16   be tolled under 28 U.S.C. § 2244(d)(2).

17       Cantrell also claims that his motion for a stay and abeyance of 90 days

18   should have been granted, tolling the time to exhaust his second round of state

19   habeas petitions for an additional 90 days. Cantrell filed this motion December 12,

1    2008, but the statute of limitations had already run six months earlier.  Granting the

2    motion would not allow Cantrell to return to federal court within the statute of

3    limitations because the time limits expired before the motion for stay and abeyance

4    was filed.  The motion for stay and abeyance, filed after the statute of limitations

5    had run, is therefore denied as moot.

6         B.    Relation Back

7         Cantrell's eight new untimely claims must be dismissed unless they relate

8    back to the timely claims.  The Supreme Court has held that relation back is in

9    order if the claim to be amended is tied to the original timely petition by "a

10   common core of operative facts."  Mayle v. Felix, 545 U.S. 644, 664 (2005).  An

11   amended habeas petition does not relate back (and thereby escape the one-year

12   time limit set forth in 28 U.S.C. § 2244(d)) when it asserts a new ground for relief

13   supported by facts that differ in both "time and type" from those set forth in the

14   original pleading.  Mayle, 545 U.S. at 650.  Where untimely claims arise from a

15   "single occurrence" they relate back, but when they arise from "discrete

16   occurrences [that] depend upon separate transactions and do not share a common

17   core of operative fact," they do not relate back.  Hebner v. McGrath, 543 F.3d

18   1133, 1139 (9th Cir. 2008).  Cantrell did not address the issue of whether any of

19   his claims properly related back, instead treating this court's decision to allow

34

1    consideration of whether the claims raised in the SAP were futile as dispositive of

2    that issue.  Cantrell is in error to so conclude, but the court concludes that none of

3    Cantrell's new claims properly relate back to the FAP.

4        Claims 10, 11, and 12 all raise issues of ineffective assistance by Cantrell's

5    *appellate* counsel, while claims 14 and 15 all raise alleged errors committed by the

6    trial court during sentencing.  None of Cantrell's timely claims challenge any

7    events that occurred on appeal, and none of them challenge the constitutionality of

8    actions taken by the trial court during sentencing.  Therefore none of these claims

9    relate back because they are claims against different actors regarding activity that

10   occurred at a different time than the claims raised in the FAP.

11       Claim 9, which alleges ineffective assistance of trial counsel in failing to

12   request a jury instruction on unanimity, pursuant to CALJIC 17.01, and Claim 13,

13   which alleges failure by the trial court to provide the unanimity instruction on its

14   own motion, similarly do not relate back to the FAP.  Although Cantrell's timely

15   claims included claims that certain jury instructions *given* at trial were

16   unconstitutional, and that his counsel was ineffective, Claims 9 and 13 are simply

17   new claims and do not share any common nucleus of operative fact with these prior

18   claims.  These claims are not of the same time or type as the earlier claims.  Simply

19   invoking the same moniker—jury instructions or due process—is not sufficient.

1   Cantrell's remaining claim, Claim 16, alleges prosecutorial misconduct in

2   the use of claims for which Cantrell was accused but purportedly acquitted to

3   prove a propensity for committing sex offenses.  Cantrell's timely Claim 8 alleges

4   prosecutorial misconduct for discussing evidence in both opening and closing

5   arguments that was not presented at trial.  Claim 8 and Claim 16 arise from "two

6   discrete occurrences."  While both claims are related to the prosecutor's case

7   against Cantrell, each claim depends on "separate congeries of facts." Hebner, 543

8   F.3d at 1139 (citing Mayle, 545 U.S. at 646).  Thus, Claim 16 does not relate back

9   to Claim 8.

10   None of the claims in the Second Amended Petition relate back to the timely

11   filed First Amended Petition and thus Claims 9, 10, 11, 12, 13, 14, 15, and 16 are

12   time barred.

### CONCLUSION

14   For the reasons stated above, the petition for writ of habeas corpus is

15   DENIED.

16   Dated: March 23 , 2010

                                               *M. Margaret McKeown*

17   HON. M. MARGARET MCKEOWN

18   UNITED STATES CIRCUIT JUDGE

19   Sitting by Designation

20